UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KEVIN BRYANT,

              Petitioner,

    -vs-

DALE A. ARTUS, Superintendent
Wende Correctional Facility,


              Respondent.
_____

**DECISION AND ORDER**

**No. 11-CV-1010(MAT)**

## I.  Introduction

Petitioner Kevin Bryant ("Petitioner"), through counsel, has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered October 29, 2004, in New York State, County Court, Monroe County, convicting him, upon a jury verdict, of Murder in the First Degree (N.Y. Penal Law ("Penal Law") § 125.27[1][a][vi], [b]), and sentencing him to life imprisonment without the possibility of parole.

## II.  Factual Background and Procedural History

### A.  Indictment

By Monroe County Indictment No. 2003/392, Petitioner was charged with first-degree murder (Penal Law 125.27[1][a][vi], [b]) for hiring Cyril Winebrenner ("Winebrenner") and Cassidy Green ("Green") to kill his wife, Tabatha Bryant ("Tabatha"). See Resp't Ex. A at A5-A7.

**B. Trial, Verdict, and Sentencing**

**1. The People's Case**

Late in November 2002, Green was starting an escort service[1] and looked for an attorney to help her start her business. She came to find Petitioner, a general practice attorney, by "pick[ing] his name out of the Yellow Pages." Trial Trans. [T.T.] 278-279. In December 2002, Green went to Petitioner's law office, where she encountered Winebrenner, who worked there. T.T. 279-280. Winebrenner was Petitioner's brother-in-law, as he was the step-brother of Petitioner's wife, Tabatha. Green and Winebrenner became romantically involved, and, approximately one month later, she moved in with Winebrenner, who was, at that time, living with Petitioner and Tabatha and their two young sons at 2 Pennicott Circle in Penfield, New York. T.T. 279-281. Green testified that, at the time she initially met Petitioner, she supported herself by working as an escort and selling cocaine. T.T. 281. Green testified that while she lived in Petitioner's home, Petitioner and Tabatha argued frequently. T.T. 286-289.

Keith Cromwell ("Cromwell") testified that he met Tabatha in January of 2003 and began a romantic relationship with her. According to him, the relationship progressed steadily from the time the two met until June 2003. T.T. 55, 58.

---

[1] Green testified that, to her, "escort service" meant "[s]trictly hot oil rubs, lingerie modeling, dances." T.T. 279.

At some point, Petitioner learned of the relationship his wife was having with Cromwell and hired private investigator Louis Falvo ("Falvo") to gather evidence in June 2003. T.T. 76-77. Falvo engaged in surveillance of the couple, which continued until July 1, 2003. Thereafter, Falvo briefed Petitioner and provided him with video documentation of the couple. T.T. 80-99.

Weeks before Tabatha's death, Petitioner made several inquiries about how he could kill his wife. Green testified that Petitioner asked her whether $5000 would be enough money to "get rid of [Tabatha's] body" and whether Winebrenner would do it. T.T. 292-293. Green testified that she spoke with Winebrenner and later informed Petitioner that Winebrenner had indicated to her that $5000 was enough and that he would look into how to do it. T.T. 293-294.

At the end of June 2003, Vince Hoskins ("Hoskins"), who was living at a friend's trailer in West Bloomfield where Winebrenner and Green were also staying at that time, went with Winebrenner to Petitioner's law office on a criminal-related legal matter. T.T. 460-461. At Petitioner's law office, Hoskins testified that he saw Petitioner give a manila folder to Winebrenner, who opened it and removed the contents -- "pictures and papers with times and places written on them." T.T. 465. Hoskins testified that Petitioner said to Winebrenner, "here's the things that you asked for." T.T. 466. According to Hoskins, Petitioner showed him one

of the photographs and said that it was his wife and her boyfriend. Petitioner "sounded agitated" and told Hoskins that when he was at his son's daycare, a boy approached him and asked if Petitioner was his son's "other daddy." T.T. 468. Petitioner then stated to Hoskins that "he was not going to lose his kids in a divorce." T.T. 469.

On July 4, 2003, Petitioner had a dinner party at his house, at which Tabatha and their two children were present. Green testified that she and Winebrenner attended the party. According to Green, Petitioner was "very angry" with Tabatha at the party. T.T. 297. Green testified that, after dinner, she went upstairs with Tabatha and Tabatha's young sons. As she was proceeding downstairs, she overheard Petitioner tell Winebrenner, "it's got to be done, it's got to be done now." T.T. 298. The following day, Petitioner had a cookout at Mendon Ponds Park, which was attended by Green, Green's parents, and Tabatha and her young sons. Green testified that Petitioner and Tabatha had an argument at the cookout, and Green left with Petitioner in Petitioner's car. T.T. 299-300. Green and Petitioner drove to the trailer in West Bloomfield, and Petitioner indicated that he needed to speak with Winebrenner. When they arrived at the trailer, Winebrenner came outside and the two men walked around the front of the trailer together. T.T. 300.

On July 8, 2003, Petitioner approached Timothy Hill ("Hill"), a friend of Jennifer Burch ("Burch"), one of Petitioner's clients. Hill testified that while he was picking up Burch following her meeting with Petitioner at his law office, Petitioner got into the passenger seat of the truck he was driving. T.T. 494-496. Petitioner asked Hill what type of work he did and inquired as to whether Hill did any "demolition work." T.T. 496. Hill testified that he asked Petitioner what he needed, to which Petitioner responded by asking if Hill could either "terminate his wife" or find him a gun. T.T. 497-498. Petitioner offered Hill $500 in advance and another $5000 afterwards, and then showed Hill a picture of Tabatha and his two children. T.T. 498-499. When Hill asked Petitioner why he wanted to kill his children's mother, Petitioner stated that she "crossed him" and he "couldn't deal with that." T.T. 503. Hill immediately told Petitioner to get out of the truck, and, as he did, Petitioner took out a "roll of bills" from a duffel bag, peeled off $500, and gave it to Hill. Hill took the money but testified that he did not intend to harm Tabatha or get Petitioner a gun. T.T. 503-504.

Green testified that, on the evening of July 13, 2003, she called Petitioner at home to determine whether Tabatha and Petitioner would be home and the location of the children. Petitioner told her that Tabatha was laying down on the couch, the kids were going to bed, and he was going to be home the rest of the

night.   Green testified that she then told Petitioner that "[Winebrenner] wanted to get everything done."  Petitioner told her to call him when "[they] [were] on [their] way out."  T.T. 305.  At Petitioner's request, Green called Petitioner when they were leaving.  T.T. 305-307.  Just prior thereto, Winebrenner put rubber gloves in his pocket and polished the bullets for Green's .22 bolt action rifle before reloading it.  Green testified that she and Winebrenner then got into her pink Monte Carlo, which was loud because it had no tail pipes or catalytic converter, and drove to Petitioner's home.  T.T. 306-309.

When Green and Winebrenner reached Petitioner's house, all of the doors leading into the house were locked.  T.T. 310-311.  Green and Winebrenner went into the garage and looked through various envelopes that Petitioner had told Green would be under a filing box and would contain money, but there was no money in them.  T.T. 311-312.  Green and Winebrenner left Petitioner's garage and drove to a Noco gas station about two minutes from Petitioner's house where Green called Petitioner from a pay phone and told him that "everything was locked."  T.T. 313.  Petitioner told Green to come back and "that everything would be taken care of."  T.T. 313.  Green testified that, while on the phone with Petitioner, it was agreed that Winebrenner was to speak with Petitioner when he was done.  T.T. 312-313, 1185-1186.

When Green and Winebrenner returned to Petitioner's house, "everything was open." T.T. 314. Winebrenner took the rifle and went into Petitioner's house alone while Green waited in the car. While Winebrenner was inside the house, Green heard a sound "like a small champagne cork." T.T. 315. When Winebrenner returned to the car, he was covered in blood. He put the gun in the back seat and put his jacket in a garbage bag. T.T. 314-315. Green drove to a gas station where Winebrenner changed his clothes. The duo drove to a second gas station where Winebrenner bought beer and cigarettes, and then drove to a third gas station where Green called Petitioner from a pay phone. T.T. 316-317. During one of the trips to the gas station, Green saw Winebrenner pull out an envelope of money and count $5000. Winebrenner did not have any money prior to going to Petitioner's house. T.T. 326. As they drove home, Winebrenner told Green that he shot Tabatha three times and "that he had to cut her to make her stop breathing." T.T. 325-326. Green also saw Winebrenner pull out a large kitchen knife, wipe it off, and throw it out of the window somewhere near Mendon Ponds Park. T.T. 327-328. Once they returned to the trailer where they were staying, Winebrenner said that he had to get rid of his clothes, so the two got back into the Monte Carlo. When they realized the car was not working properly, they returned to the trailer and asked Emily Gibbs ("Gibbs"), Hoskins's girlfriend, to borrow their car. T.T. 329. Green and Winebrenner put the bag of

clothes and the gun in the borrowed car and drove to the Town of
Bloomfield where Winebrenner discarded his jacket in a tunnel on
Wesley Road and his t-shirt on Stetson Road. T.T. 330. They then
drove to Silvernail Road and discarded Winebrenner's pants in some
bushes. T.T. 331. Then, they went to Clay Street, where
Winebrenner put the rifle in his car. T.T. 332. When they
returned to the trailer, Winebrenner packed some clothes in an Army
bag and put the bag in Green's Monte Carlo. Winebrenner left $2000
for Green on the bed. T.T. 333.

Meanwhile, just after midnight, Petitioner called 911 and
reported that his wife had been shot. T.T. 814-815. Investigator
James Beikirch, who responded to the crime scene, found no signs of
forcible entry into Petitioner's home. T.T. 568. He testified
that he entered Petitoner's home through the garage and saw Tabatha
lying on a bed in the den. T.T. 564. Petitioner spoke with Road
Patrol Deputy Bridget Davis at the end of the driveway. Petitioner
told her that he had received a phone call from a female about
10 minutes before the shooting, but did not know who had called.
T.T. 720-721. Petitioner told Deputy Davis that he and his wife
were planning on going to a church retreat that coming Wednesday.
T.T. 724. He told her that they had been having marital problems
and that Tabatha had been having an affair with Cromwell. He told
her that he learned about the affair during the last week of April
and hired a private investigator, who had given him photographs of

Tabatha and Cromwell together. Petitioner told her "that he wanted Tabatha to get rid of the boyfriend so that they could work on the two of them, and Tabatha said no." T.T. 725. Petitioner indicated further that he was contemplating divorce proceedings, and noted that he was an attorney. T.T. 724-726.

When Deputy Davis asked Petitioner about Tabatha's death, he told her that he was upstairs when he heard one or two shots. According to Petitioner, Tabatha screamed, "oh my God." T.T. 732. Deputy Davis observed that the garage door was open. Another deputy who had arrived at the scene, asked Petitioner about the open garage door, to which Petitioner responded that he probably forgot to close it when he took out the trash. T.T. 734. Petitioner stated that he came home from work at 10:30 p.m. that night and had starting taking the trash out. He then left to get a cup of coffee and when he came back, he took the rest of the garbage out. T.T. 735-737. Petitioner also told Deputy Davis that Winebrenner and Green had lived with them in the past, and Tabatha was stressed out about them living there and wanted to charge the two more rent. T.T. 744-745.

Investigator Paul Siena met with Petitioner at the crime scene and asked Petitioner to go with him to the police station. Petitioner agreed. T.T. 897. There, Petitioner told Investigator Siena that when he got home from work at about 10:30 p.m., he found his wife upstairs with the children asleep in his bed. Petitioner

woke her up and asked if her she wanted to sleep downstairs, since she was no longer sleeping in the marital bedroom. T.T. 907-908. He said that he then took the garbage out and went to get a coffee at the Noco gas station. When he saw that it was closed, he returned home at about 11:15 p.m. T.T. 908-909. When he returned to his house, he saw that Tabatha was asleep on the sofabed. T.T. 909. He collected more garbage, took it out to the curb, and then got ready for bed. T.T. 910. Petitioner said that he would normally lock the doors before he went to bed, but was not sure if he had locked them that night. T.T. 974. Petitioner indicated that he had received a strange phone call at about 11:50 p.m. -- an automated MCI operator said he had a collect call. He accepted the call but the voice was muddled and he could not hear what the person was saying, so he hung up. T.T. 910. After the phone call, Petitioner said that he got into bed and began reading. T.T. 910. About ten minutes later, he heard two shots and heard his wife yell, "oh my God. Oh my God." Then he heard a third shot. He said he then went downstairs, saw Tabatha, and called 911. T.T. 911.

At around 5:30 a.m., Investigator Siena took a break, and then resumed questioning Petitioner. T.T. 916. Petitioner said that he had hired a private investigator after learning that his wife was having an affair with Cromwell. He said that he was upset, but had come to accept it. T.T. 917-919. Petitioner said that, at some

point, he had given Tabatha an ultimatum to choose between him and Cromwell and that Tabatha had told him not to ask her to do that because he [Petitioner] would lose. T.T. 920. Petitioner told police that he could not think of anyone who would want to harm his wife, although he mentioned a man named Rocky, a former client of his who he knew carried a gun. T.T. 922-923, 932-933. Petitioner told Investigator Siena that Winebrenner and Green had lived with Petitioner and Tabatha, and that "some bad blood had arisen" between his wife and Winebrenner, while Petitioner and Winebrenner had grown close. T.T. 926. When Investigator Siena asked Petitioner who might have been capable of murdering his wife, he said that, given the right circumstances, "we are all capable." T.T. 931. At that point, Petitioner's demeanor changed, and he avoided eye contact and began tapping his fingers on the table. T.T. 931. Investigator Siena then informed Petitioner of his Miranda rights, which Petitioner waived. T.T. 933-934.

Investigator Siena testified that, one point, he told Petitioner that he did not think Petitioner was telling him everything, to which Petitioner responded that he felt responsible. Petitioner's hands were shaking, his eyes began to tear, and he started tapping his feet. T.T. 963. Petitioner said that he "wanted to get rid of [his wife]" and that the divorce papers were ready but had not been filed. T.T. 965. When Investigator Siena asked Petitioner if there were any other reasons that he felt

responsible, Petitioner stated to him, "let's just say I'm responsible." T.T. 966. Investigator Siena asked Petitioner if he was admitting involvement in the murder, to which Petitioner responded that he was not saying anything. Investigator Siena again began talking to Petitioner about his marital problems. During this conversation, Petitioner told him that his wife "had an ability to push the buttons." T.T. 981. Investigator Siena asked Petitioner if he killed his wife, to which Petitioner responded that he could not answer that question. T.T. 981-982. Petitioner then asked to used the restroom and, as he walked away, he began to cry. Investigator Siena asked Petitioner if he was okay, and indicated that the police would get to the bottom of the matter. In response, Petitioner stated that "[they] better, or he'd f-ing kill[] [Investigator Siena]." T.T. 983.

At Petitioner's house, police recovered from the master bedroom a bank envelope containing $3500 in $100 bills found between the mattress and boxspring. T.T. 574-578. Winebrenner's clothing was later recovered from the locations that Green had described. Green led the police to Petitioner's jacket. T.T. 334, 590. Winebrenner's shirt was recovered by a local resident who turned it over to the police. T.T. 267-269, 593-595. Police executed a search warrant on Winebrenner's Pontiac on Clay Road and recovered a 22 bolt action rifle from the trunk of his car. T.T. 586. Blood stains recovered from the rifle and Winebrenner's

jacket matched Tabatha's DNA.  T.T. 1235.  The bullet recovered
from Tabatha's body was consistent with having been fired from a
22 bolt action  rifle.  T.T. 881-886.

Baylea Woods ("Woods") testified that, on the night of the
murder, she was visiting a friend that lived across the street from
Petitioner.  T.T. 255.  She testified that, around 11:00 p.m., she
observed an "older" red car pull into Petitioner's driveway, leave
five minutes later, and then return about thirty minutes later.
T.T. 256-257.  She testified that the car was "really loud."
T.T. 256.

Deputy Medical Examiner Dr. Caroline Dignan testified that
Tabatha suffered a gunshot wound to the right eye and multiple stab
wounds to her neck, upper chest, back, and arm.  T.T. 1245, 1250,
1255.  The main cause of death was multiple stab wounds, and the
gunshot wound was a significant contributing factor.  T.T. 1262.

### 2.  The Defense's Case

Reverend Michael Allen, pastor of Community Church of Christ
in Penfield, New York, testified that Petitioner had discussed his
family problems with him in mid-June 2003.  According to him,
Petitioner and his wife were trying to work out their problems and
were planning to go on a church retreat.  T.T. 1330-1333.  Kathleen
Barone, Petitioner's legal secretary, testified that Petitioner had
told her that he planned on attending the church retreat from
July 16 through July 20.  T.T. 1289-1291.

Gibbs testified that, at about 11:00 p.m. on the night of the murder, Green and Winebrenner borrowed her 1990 Geo Prism. T.T. 1298, 1301. Gibbs testified that she heard the two drive away in her car and could distinguish the noise that her car makes from the noise of Green's car. T.T. 1300-1301. According to Gibbs, Green and Winebrenner returned with Gibbs's car three hours later. T.T. 1302. On cross-examination, Gibbs repeatedly invoked the Fifth Amendment when questioned about her drug use and drug dealings. T.T. 1304, 1307. She testified that her memory of the night of the murder was not good and that she had signed a sworn statement that she did not remember whether Green and Winebrenner had driven the Monte Carlo. T.T. 1308-1310.

Tyrone Singletary ("Singletary") testified that he had been at a party across the street from Petitioner's house on the night of the murder. He testified that about 11:45 p.m., he went outside and saw a light blue four-door sedan pull into the driveway across the street. T.T. 1316-1318. He testified that the car looked similar to a photograph of Gibbs's Geo Prism. T.T. 1320, 1324. According to him, the headlights and the taillights of the car flashed four or five times. T.T. 1319-1320. On cross-examination, Singletary acknowledged that when the police interviewed him on July 13, 2003, he was unable to remember what time he had seen the car, and stated that the car may have been a Nissan Ultima. Three weeks later when he spoke with the police, Singletary told the

-14-

police that the vehicle he saw was a "95-97" Nissan. T.T. 1322-1325.

### 3. The Verdict and Sentence

At the close of the trial, Petitioner was found guilty as charged, and was sentenced to life imprisonment without the possibility of parole. T.T. 1615; Sentencing Mins. [S.M.] S.M. 35.

### D. The Direct Appeal

Through counsel, Petitioner appealed his judgment of conviction in the Appellate Division, Fourth Department on the following grounds: (1) the trial court improperly permitted the jury to consider a theory of prosecution that was not included in the indictment, as amplified by the bill of particulars; and (2) the trial court improperly admitted evidence of Petitioner's uncharged attempt to hire Hill to kill his wife. See Resp't Ex. B. The Appellate Division unanimously affirmed the judgment of conviction on June 11, 2010. People v. Bryant, 74 A.D.3d 1794 (4th Dep't 2004) (Resp't Ex. E). Petitioner subsequently moved for reconsideration (Resp't Ex. F), which was denied On October 1, 2010. Bryant, 77 A.D.3d 1458 (4th Dep't 2010) (Resp't Ex. H). The New York Court of Appeals denied leave to appeal, and Petitioner's subsequent motion for reconsideration was also denied. Bryant, 15 N.Y.3d 919 (Resp't Exs. I, O).

## E.    The Federal Habeas Proceeding

This habeas corpus petition followed, wherein Petitioner seeks relief on the same two grounds he raised on direct appeal.  See Pet. at 6-37 (Dkt. No. 1); Pet'r Mem. of Law, Points I-II (Dkt. No. 2).   Respondent filed a Response and Memorandum/Brief in opposition to the petition (Dkt. Nos. 8, 9), and Petitioner filed a Reply thereto (Dkt. No. 13).

For the reasons that follow, Petitioner's request for a writ of habeas corpus is denied and the habeas petition is dismissed.

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."   28 U.S.C. § 2254(b)(1)(A);   see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999);   accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995).   "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts."   Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).   Petitioner's claims, which were raised in

federal constitutional terms in the state court, are exhausted and properly before this Court.[2]

**IV.   The AEDPA Standard of Review**

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  As the parties correctly assert in their respective papers, Petitioner's habeas claims were adjudicated on the merits in state court and the AEDPA standard of review therefore applies to them.

**V.   Analysis of the Petition**

**1.   Petitioner's Sixth Amendment Right to Fair Notice of the Charges Against Him was Not Violated**

Petitioner argues, as he did on direct appeal, that his Sixth Amendment right to fair notice of the charges against him was violated when the trial court improperly permitted the jury to

---

[2]

    The parties do not dispute the issue of exhaustion, and agree that the habeas claims are exhausted for purposes of federal habeas review.  <u>See</u> Pet. ¶ 22A-B; Resp't Mem. of Law at 13.

consider a theory of prosecution that was not included in the indictment, as amplified by the bill of particulars. See Pet. at 6-12. The Appellate Division rejected this claim on the merits (Bryant, 74 A.D.3d at 1794-95), and thus the AEDPA applies. Under that standard, the claim is meritless.

A violation of the federal constitution's due process clause results when a criminal defendant is convicted of a crime he was never charged with committing: "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge . . . are among the constitutional rights of every accused." Cole v. Arkansas, 333 U.S. 196, 201 (1948) (citation omitted); accord, e.g., Ricalday v. Procunier, 736 F.2d 203, 207 (5th Cir. 1984). The indictment, which must provide the defendant with fair notice of the accusations against him so that he will be able to prepare a defense, prevents the prosecutor from usurping the powers of the Grand Jury by ensuring that the crime for which defendant is tried is the same crime for which he was indicted, rather than some alternative seized upon by the prosecution in light of subsequently discovered evidence. In other words, the indictment serves to protect a defendant from variances in proof. Finally, an indictment prevents later retrials for the same offense in contravention of the constitutional prohibition against double jeopardy. From a federal constitutional standpoint,

proof at trial that varies from the indictment potentially compromises the functions of the indictment to guarantee the defendant his Sixth Amendment right to fair notice of the charges against him. United States ex rel. Richards v. Bartlett, No. CV-92-2448, 1993 U.S. Dist. LEXIS 12743, 1993 WL 372267, at *4 (E.D.N.Y. Sept.9, 1993) ("However, the general rule that an accusatory allegation, such as an indictment, and proof at trial must correspond rests not only upon the grand jury clause of the Fifth Amendment but also on the requirements (1) that the accused be protected against another prosecution for the same offense; and (2) that the accused be informed of the charges against him, so that he may present his defense without being taken by surprise by evidence offered at trial.") (citing Berger v. United States, 295 U.S. 78, 83 (1935).")). In applying these constitutional principles to the instant case, Petitioner's claim is meritless.

Here, the indictment charged Petitioner with first degree murder, and specifically stated as follows:

> [t]he defendant, on or about July 13, 2003, in the County of Monroe, State of New York, being more than eighteen (18) years old at the time, with intent to cause the death of Tabatha Bryant, he solicited, requested, commanded, importuned, and/or intentionally aided another person or persons to cause the death of Tabatha Bryant, and the other person or persons caused the death of Tabatha Bryant by shooting her with a rifle and stabbing her multiple times with a knife, and the defendant procured the commission of the killing pursuant to an agreement with a person or persons other than the intended victim to

> commit the same for the receipt, or in
> expectation of the receipt, of anything of
> pecuniary value from a party to the agreement
> or from a person other than the intended
> victim acting at the direction of a party to
> such agreement.

See Resp't Ex. A at A5-A-7. The indictment tracked the language of the statute defining the first-degree murder charge as well as New York's accessorial liability statute. See Penal Law §§ 20.00, 125.27[1][a][vi], [b]. Furthermore, the indictment was supplemented by a bill of particulars, which alleged that the crime occurred, "[o]n or about July 13, 2003, approximately between 11:45 p.m. and 12:00 midnight, at or near 2 Pennicott Circle, in the Town of Penfield, County of Monroe, State of New York." See Resp't Ex. A at A1629. The bill of particulars further informed Petitioner that he was being accused of acting as both an accomplice and a principal. The People refused to provide additional information about the substance of the allegations that Petitioner acted as an accomplice to the killing because that information was outside the scope of the bill of particulars. The People did provide the following information in response to Petitioner's request:

> [a]s a practical matter, defense counsel is
> aware that Cyril Winebrenner has been indicted
> as an accomplice in the shooting and stabbing
> death of Tabatha Bryant, and that Cassidy
> Green has a homicide charge pending the action
> of the Monroe County Grand Jury as an
> accomplice in causing the death of Tabatha
> Bryant. It is alleged that Kevin Bryant made
> an agreement with Cyril Winebrenner and/or
> Cassidy Green to kill Tabatha Bryant for a sum
> of United States currency, and made payment

> pursuant to such agreement upon performance of the agreement. The People refuse to state any further particularization of the kind requested, as such is beyond the scope of a bill of particulars in that it requests evidentiary information pertaining to how the People intend to prove the elements of the offense charged.

See Resp't Ex. A at A1630-31. As Respondent points out, the proof at trial substantially corresponded to the information contained in the indictment and the bill of particulars. See Resp't Mem. of Law at 18. Green's testimony established that Petitioner had made an agreement with Winebrenner to kill Tabatha. Petitioner agreed to pay Winebrenner $5000 for committing the crime. Late on the night of July 13, 2003, Green and Winebrenner drove to Petitioner's house at 2 Pennicott Circle to carry out the murder Petitioner had hired them to commit. When Winebrenner and Green got to Petitioner's house, they could not gain entry because the doors were locked. Green called Petitioner, and Petitioner told them that he would take care of it and directed them to come back. When they did, the doors were unlocked, allowing Winebrenner to enter the house. Once inside, Winebrenner shot Tabatha in the head and stabbed her multiple times, causing her death. Petitioner then paid Winebrenner $5000 per the agreement. This trial evidence conformed to the charge, time, place, nature and circumstances of the offense set forth in the indictment, as amplified by the bill of particulars. See United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975) ("an indictment need do little more than to track

the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.").

Despite the above discussion, Petitioner maintains that the bill of particulars excluded the possibility of his role as an accomplice  as involving anything other than hiring and paying Winebrenner to kill his wife.  <u>See</u> Pet'r Mem. of Law at 4-5.  The Court rejects this contention insofar as Petitioner's argument is based simply on an inaccurate/selective reading of the bill of particulars.  In that document, the People did not state that there were no additional facts to establish Petitioner's accessorial liability (<u>see</u> Resp't Ex. A at A1630-31);  rather, the People refused to provide further details regarding the allegations establishing his role as an accomplice, correctly indicating that they were not required to provide evidentiary information about how they would prove the elements of the offense charged.  <u>See</u> <u>Tramunti</u>, 513 F.2d at 1113.

Moreover, the trial court's jury instructions on accessorial liability did not, as Petitioner alleges, alter the prosecution's theory of the case such that his constitutional rights were compromised.  As explained above, both the indictment and the bill of particulars specifically alleged that Petitioner acted both as a principal and as an accomplice in the murder of Tabatha.  Indeed, the indictment itself tracks the accessorial liability language of Penal Law § 20.00 and specifically cites thereto.  Furthermore,

under New York Law, "[t]here is no distinction between liability as a principal and criminal culpability as an accessory[,] and the status for which the defendant is convicted has no bearing upon the theory of the prosecution." <u>People v. Duncan</u>, 46 N.Y.2d 74, 79-80 (1978); <u>see also</u> <u>People v. Guidice</u>, 83 N.Y.2d 630 (1994) ("A state indictment need not allege whether a defendant is charged as a principal or an accomplice, and the distinction generally is considered 'academic.'"); <u>People v. Rivera</u>, 84 N.Y.2d 766 (1995) (the elements of a crime remain the same regardless of whether a defendant is charged as a principal or as an accomplice). This means that the jury could have convicted Petitioner of first-degree murder either as a principal or as an accomplice, and the choice it made in that respect is of no moment. The evidence presented at trial permitted the jury to conclude that Petitioner acted as a principal by procuring Green and Winebrenner to kill his wife, and the same evidence also permitted the jury to conclude that Petitioner acted as an accomplice to the act of killing by unlocking the doors to his home so that Winebrenner could enter and kill Tabatha.

Similarly, there is no merit to Petitioner's contention that the trial court's instruction on the first-degree murder statute -- i.e., that the jury could consider the evidence presented at trial in support of the "killer" portion of the statute as well as the "procurer" portion -- allowed the jury to consider a theory of

prosecution that was not alleged in the indictment and bill of particulars, thereby compromising his constitutional right to fair notice of the charges against him. With respect to this particular issue, the Appellate Division determined that the trial court erred in charging the jury that the People had to prove beyond a reasonable doubt that Petitioner committed the killing **_or_** procured the commission of the killing pursuant to an agreement, rather than charging only that defendant procured the commission of the killing. See Bryant, 74 A.D.3d at 1794-95. As an initial matter, claims based on errors in jury instructions are matters of state law that do not ordinarily raise federal constitutional questions. See McEachin v. Ross, 951 F. Supp. 478, 483 (S.D.N.Y. 1997) ("Mere questions of state law are not grounds for federal habeas relief.") (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Errors in state jury charges are questions of state law and are therefore not reviewable on federal habeas corpus absent a showing that "the jury charge deprived the defendant of a federal constitutional right." Id. (citing Blazic v. Henderson, 900 F.2d 534, 540 (2d Cir. 1990)). The standard of review of state jury instructions in a habeas petition is "not whether 'the instruction is undesirable, erroneous or even universally condemned [but whether] the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Id. (quoting Wright v. Smith, 569 F.2d 1188, 1191 (2d Cir. 1978) (quoting Cupp v. Naughten, 414

U.S. 141, 146-7 (1973))); see also Blazic, 900 F.2d at 541. Thus, despite the trial court's error, Petitioner is still required to make a showing of prejudice in order to obtain habeas relief. The Appellate Division reasonably determined, in denying this claim, that the People maintained throughout all phases of the case that Petitioner ***procured*** the commission of the killing of Tabatha by making an agreement with Green and Winebrenner to kill her for a sum of money.

Finally, Petitioner's reliance on a habeas case decided by the Ninth Circuit, Sheppard v. Rees, 909 F.2d 1234 (9th Cir. 1989), to support his claim is misplaced. Petitioner argues in his supporting memorandum and his reply that this case "is on-point in all respects." See Pet'r Mem. of Law at 28-45; Reply at 3. In that case, the petitioner was charged with one count of murder and was tried before a jury on the theory that the killing was premeditated and deliberate. The prosecution requested that instructions be given on felony-murder, and the trial court granted the instruction even though felony-murder had never been mentioned during the trial. The jury subsequently convicted the petitioner without indicating the legal theory on which it had relied. The district court denied the Petitioner's request for a writ of habeas corpus, which alleged a violation of his Sixth Amendment right to fair notice of the charges against him. On appeal, the Ninth Circuit reversed the judgment and granted the writ, finding that

the petitioner did not receive adequate notice to enable him to prepare a proper defense to a charge of felony-murder, and the violation of his Sixth Amendment rights was not harmless error. See Sheppard, 909 F.2d at 1234-1238. This case is legally and factually unlike Petitioner's case, and lends no support to his argument.

In Sheppard, the trial court instructed the jury on a felony-murder theory despite the fact that neither felony-murder nor the underlying charge of robbery was listed in the charging information and "[a]t no time during pre-trial proceedings, opening statements, or the taking of testimony was the concept of felony murder raised, directly or indirectly." Id. at 1235. Furthermore, the State conceded in Sheppard that Petitioner's Sixth Amendment right to notice and opportunity to prepare a defense had been violated "'because a pattern of government conduct affirmatively misled the defendant.'" Id. at 1236. That is not the case here. Unlike Sheppard, Petitioner was prosecuted and convicted for exactly the same crime for which he was indicted, to wit: first degree murder, in violation of New York's so-called "murder for hire" statute (Penal Law § 125.27[1][a][vi], [b]). The People theorized that Petitioner acted as an accessory to the act of killing and that he procured the commission of the killing pursuant to an agreement, and that theory remained consistent throughout the trial. Petitioner was apprised of the nature of the charges against him

from the inception of the case and was afforded the opportunity to defend against same at every stage of the trial, including pre-trial proceedings, the presentation of evidence and cross-examination, and closing.

In sum, Petitioner has failed to show that the state courts engaged in an unreasonable application of clearly established Federal law, as determined by the Supreme Court, or rendered a decision based on an unreasonable determination of the facts in the record. The claim is meritless and is therefore denied in its entirety.

## 2. Petitioner was Not Deprived of a Fair Trial by Admission of Prior Bad Act Evidence

Petitioner argues, as he did on direct appeal, that his due process rights were violated when the trial court improperly admitted evidence, pursuant to People v. Molineux, 168 N.Y. 264 (1901), of Petitioner's prior bad acts, namely a prior attempt by Petitioner to have his wife killed. See Pet. at 13-37. Specifically, he claims that the trial court improperly permitted the prosecution to introduce testimony from Burch and Hill that Petitioner had attempted to hire Hill to kill Tabatha for $5000 prior to her murder. The Appellate Division rejected this claim on the merits. Bryant, 74 A.D.3d at 1795. As discussed below, this claim is meritless and does not warrant habeas relief.

As an initial matter, a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or

treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must demonstrate that the error deprived him of his right to "a fundamentally fair trial." Taylor, 708 F.2d at 891; see also Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'" (quoting Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted))).

In determining whether a state court's alleged evidentiary error deprived petitioner of a fair trial, federal habeas courts engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. See Wade v. Mantello, 333 F.3d 51, 59-60 & n.7 (2d Cir. 2003); Ramos v. Phillips, No. 104-CV-1472-ENV, 2006 U.S. Dist. LEXIS 89699, 2006 WL 3681150, at *6 (E.D.N.Y. Dec 12, 2006). Despite Petitioner's position to the contrary (see Pet'r Mem. of Law at 48), the trial court's

ruling was not erroneous as a matter of state law, and, even assuming it was (a finding which this Court does not make), it cannot be said that such error amounted to the denial of Petitioner's constitutional right to a fair trial.

Under New York law, "[a] trial court may admit into evidence uncharged crimes when the evidence is relevant to a pertinent issue in the case other than a defendant's criminal propensity to commit the crime charged." People v. Till, 87 N.Y.2d 835 (1995). However, "[e]ven then, such evidence is admissible only upon a trial court finding that its probative value for the jury outweighs the risk of undue prejudice to the defendant." Id. (citations omitted). In People v. Molineux, the New York Court of Appeals stated that "[g]enerally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." 169 N.Y. at 293-94.

In this case, the Burch/Hill testimony that Petitioner attempted to hire Hill to kill Tabatha was properly admitted under New York law to establish Petitioner's intent and motive to commit the crime. That Petitioner had previously offered to pay Hill money in exchange for killing his wife was strong evidence that

when Petitioner made the same proposition to Winebrenner, he intended to procure his wife's murder. Further, Hill's testimony that Petitioner had stated to him that his wife had "crossed him [Petitioner]" and that Petitioner "couldn't deal with that" established Petitioner's motive for wanting to kill Tabatha. In cases of domestic violence, prior violent behavior against the same victim has been found to be admissible to establish motive and intent. See People v. Kelly, 71 A.D.3d 1520 (4th Dep't 2010); People v. Harvey, 270 A.D.2d 959 (4th Dep't 2000); see also People v. Bierenbaum, 301 A.D.2d 119, 150 (1st Dep't 2002) ("There is little or nothing by way of circumstantial evidence that is more relevant or more probative [than evidence of motivation and intent] in a circumstantial murder case."), lv. denied, 99 N.Y.2d 626 (2003)).

Moreover, the trial court acted well within its discretion in finding that the probative value of that evidence outweighed its prejudicial effect, and appropriately minimized any resulting prejudice through limiting instructions. Although, as Petitioner points out, the trial court did not explain to the jury at the particular time the witnesses were presented that it could not consider the Hill/Burch testimony as evidence that Petitioner committed the crime charged in the indictment (see Pet'r Mem. of Law at 61; T.T. 487-505, 670-686), the court did explain the

concept to the jury in a final jury instruction. The trial court judge explicitly and clearly stated as follows:

> I have allowed the People to introduce evidence that on another occasion this defendant has committed an anti-social, wrong or bad acts, namely that the defendant talked about having his wife killed with two other persons. These facts, if accepted by you as truthful and accurate, are not proof whatsoever that the defendant possesses a propensity or disposition to commit the crime charged or any other crime. The People offer this evidence solely for the purpose of establishing motive and intent.

T.T. 1586.

Moreover, even assuming the state trial court erred in admitting the evidence, any error did not deprive petitioner of his right to a fair trial. Federal courts reviewing evidentiary matters may issue a writ of habeas corpus only if the petitioner demonstrates that the alleged evidentiary error violated a constitutional right and that the error "was so extremely unfair that its admission violates fundamental conceptions of justice." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir.1998) (internal quotation omitted). "For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" Id. (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir.1992) and citing Collins v. Scully, 755 F.2d 16,

19 (2d Cir.1985) (evidence must be "crucial, critical, highly significant")).

This standard is not met here.  The prior bad acts evidence was not "sufficiently material to provide the basis for [petitioner's] conviction" nor did the prior bad acts evidence "remove a reasonable doubt that would have existed . . . without it." Dunnigan, 137 F.3d at 125 (quotations and citations omitted). Petitioner maintains that in the face of the otherwise "weak" trial evidence, the Burch/Hill testimony unfairly led the jury to accept Green's testimony that Petitioner paid Winebrenner $5000 to kill Tabatha. See Pet'r Mem. of Law 61-62.  Petitioner argues that this is evidenced by the fact that "the jury asked to have all of the Hill/Burch direct testimony (not the cross) read back to them, just before they returned a guilty verdict." Id. at 50.  The Court rejects this contention since it is speculative and because the record before this Court reflects that the jury did indeed have substantial evidence to consider -- beyond the prior bad acts evidence -- to find Petitioner guilty of first degree murder.  The evidence at trial established that Petitioner was aware that his wife was having an affair and had documented evidence of it by hiring a private investigator to follow her.  Further, Petitioner's own statements to police, as well as testimony from Green and Hoskins, established that Petitioner was angry about his wife's affair.  Additionally, Green testified about the agreement

Petitioner had made with her and Winebrenner to kill Tabatha, and that testimony was corroborated by Hoskins, who testified that Petitioner gave Winebrenner documents and photographs of Tabatha and Cromwell together, while stating that they were the items that Winebrenner had requested.  Green also testified that on the night of the murder, after she and Winebrenner went to Petitioner's house and discovered all the doors locked, she called Petitioner from a phone booth and Petitioner subsequently unlocked the garage doors so that Winebrenner could get into the house to access Tabatha. Green's testimony in this respect was corroborated by Woods, who testified that, on the night of the murder, she saw a car that looked like Green's pull into Petitioner's driveway, leave five minutes later, and then return about thirty minutes later. Telephone records corroborated Green's testimony about her call to Petitioner from the phone booth just minutes before the murder. Green's account of events was corroborated by testimony from police that there were no signs of forcible entry at the Bryant home and that the garage doors leading into the house were open.  Green's testimony about Winebrenner's efforts to discard his clothing and the rifle was corroborated by the recovery of those items from the locations she had described.  Accordingly, there is no basis for this Court to conclude that the jury would have acquitted Petitioner if it had not learned that he had previously attempted to have his wife murdered.  See e.g., Tingling v. Donelli, No. 07

Civ. 1833(RMB)(DF), 2008 U.S. Dist. LEXIS 113553, 2008 WL 4724567, at *9 (S.D.N.Y. Oct. 24, 2008) ("Moreover, in light of the other strong evidence of Petitioner's guilt . . . Petitioner has not shown that the admitted evidence removed a reasonable doubt that otherwise would have existed."); Clanton v. Rivera, No. 06 Civ. 4756 (DAB) (AJP), 2008 U.S. Dist. LEXIS 57900, 2008 WL 2839712, at *21 (S.D.N.Y. July 22, 2008) (stating that, even if state court erred in admitting evidence of prior bad act, "any such error did not deprive [petitioner] of a fundamentally fair trial, given the strong evidence against him" (collecting cases)). Additionally, the trial court's limiting instruction is further evidence that the state court did not deny petitioner a fundamentally fair trial. See, e.g., Clanton, 2008 U.S. Dist. LEXIS 57900, 2008 WL 2839712, at *22 (stating that "[l]imiting instructions have been found to militate against a finding of constitutional error" and collecting cases).

In any event, the Supreme Court has yet to establish clearly when the admission of prior uncharged crimes under state evidentiary laws can constitute a federal due process violation. See Parker v. Woughter, No. 09 Civ. 3843 (GEL), 2009 U.S. Dist. LEXIS 52419, *4-5 (S.D.N.Y. June 9, 2009) ("[P]etitioner cites no Supreme Court case, and the Court is aware of none, holding that the admission of evidence of uncharged crimes violates the Due Process Clause of the Fourteenth Amendment."). It follows that the

trial court's decision to admit the prior bad acts evidence subject to final limiting instructions cannot be said to be "contrary to" or an "unreasonable application of" clearly-established federal law for purposes of the AEDPA.

In sum, Petitioner's claim is meritless and provides no basis for habeas relief. Accordingly, the claim is denied in its entirety.

## V.    Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with

United States Court of Appeals for the Second Circuit in accordance
with the requirements of Rule 24 of the Federal Rules of Appellate
Procedure.

**IT IS SO ORDERED.**

**S/Michael A. Telesca**

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     October 23, 2012
           Rochester, New York